# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs-                                         Case No.: 2:08-cr-140-FtM-29SPC

GUILLERMO RAMIREZ-VAZQUEZ
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

     This matter comes before the Court on the Defendant Guillermo Ramirez-Vazquez' Motion to Suppress (Doc. # 24) filed on December 11, 2008. The Government filed its Response in Opposition (Doc. # 27) on December 19, 2008. An evidentiary hearing on the Motion was set before the undersigned on January 5, 2009.

     At the hearing, the Defendant was present and represented by retained counsel, Diane M. Gonzalez. The Government was represented by Managing Assistant United States Attorney Douglas Molloy. The Government called Dep. Dale Eugene Meek, Dep. Benjamin Newmark, Dep. James J. Snyder, and Dep. John Pedraza, all of the Collier County Sheriff's Office (CCSO). The Defendant called Candace Perez, the Defendant's wife as his only witness.

## TESTIMONY and EVIDENCE

**Dale Eugene Meek (Tr. 4-16)**.

     Dale Meek ("Dep. Meek") has served with the CCSO for seven (7) years with the last three (3) years serving with the CCSO's Gang Task Force. (Tr. 5: 8-15). Dep. Meek testified he was investigating a robbery that took place sometime in the late evening of July 26, 2008, and the early morning of July 27, 2008. (Tr. 6:4-6). The victim pointed out the Defendant's apartment and told

Dep. Meek his assailants had fled into that residence. (Tr. 6:10-14). However, after viewing the Defendant, the victim could not positively identify the Defendant as the assailant. (Tr. 6:20-22).

While standing in the front doorway of the Defendant's residence, Dep. Meek noticed a collage of photographs depicting the Defendant and others wearing what appeared to be gang related colors such as blue bandanas, holding guns, and making gang related gestures. (Tr. 6:23-25, 7:1-20). Dep. Meek has training in recognition of gang member identification. (Tr. 7:21-25, 8:1-3). Dep. Meek testified that he did not enter the Defendant's residence at that time but was able to recognize the gang related colors and gestures from his position at the front door. (Tr. 7:7-12). However, since none of the officers present had any formal Spanish language ability, Dep. Meek did not pursue an investigation of the gang photos at that time. (Tr. 8:8-18).

On July 30, 2008, Dep. Meek and other officers followed up on the photo collage at the Defendant's residence. (Tr. 9:6-11). According to Dep. Meek's testimony, the photo collage depicted individuals involved in Sureno gang activity. (Tr. 9:6-11). The Defendant lived in the apartment with his brother Juan, Juan's wife, Candace Perez, and the Defendant's infant daughter. (Tr. 9: 14-18). The Defendant told Dep. Meek that he and Perez occupied the front bedroom and his brother Juan and his wife occupied the back bedroom. (Tr. 10:7-12). The Defendant allowed the officers into the residence to view the photo collage. (Tr. 10:13-17). Dep. Meek stated the encounter was relaxed. (Tr. 11:1-4).

Dep. Meek testified that several of the photos contained the inscription "Southside." (Tr. 11:8-10). According to Dep. Meek, Southside is a division of the Sureno 13 street gang. (Tr.11:8-10). The photos contained images of the Defendant and his brother with blue bandanas. Dep. Meek knows from his experience that blue is the color which represents Sureno 13. (Tr. 11:10-14). Dep.

Meek also met Perez. (Tr. 11:22-25). He spoke with Perez and stated that she and the Defendant were very cooperative. (Tr. 11:24-25, 12:1-6). Perez spoke mostly with Dep. Newmark and Dep. Snyder but he did see her briefly as she passed in and out of the bedroom with the other deputies. (Tr. 11:22-25, 12:1-2).

Dep. Newmark emerged from the bedroom and told Dep. Meek that a handgun was found in the bedroom closet along with a magazine and several rounds of ammunition. (Tr. 12:21-23). Dep. Newmark also told Dep. Meek that a black ski mask was found. (Tr. 13:7-8). Dep. Pedraza, who is fluent in Spanish, read the Defendant his Miranda rights in Spanish. (Tr. 13:11-15). Dep. Meek stated he was concerned about the gun because of the apparent connection with the Sureno 13 street gang. (Tr. 13:2-8). The Defendant told Dep. Meek and Pedraza the handgun belonged to a friend of his. (Tr. 13:23-25). He said the friend left the handgun with the Defendant who was going to try and repair the broken safety. (Tr.14:1-2). According to the Defendant, the friend subsequently left the United States and returned to Mexico but left the gun with him. (Tr. 14:1-2).

Dep. Meek stated that no one ever asked them to obtain a search warrant and that no one ever said do not search the front bedroom. (Tr. 14:12-18). According to Meek's testimony, the entire encounter was consensual. (Tr. 15:1-2). Dep. Meek did state no one ever invited him inside the residence, however, he testified that officers were already present in the residence when he entered the residence. (Tr. 16:8-12).

**Benjamin Newmark (Tr. 17-28).**

Benjamin Newmark ("Dep. Newmark") has served with the CCSO since 2003 and has been assigned to the Gang Task Force for the last year and a half. (Tr. 17:17-21). Dep. Newmark received

training from the Florida Department of Law Enforcement (FDLE) in basic and advanced investigation and recognition of street gangs. (Tr. 18:4-7).

On July 30, 2008, Dep. Newmark went to the Defendant's residence with fellow Gang Task Force officers. (Tr. 17:13-15). Dep. Newmark arrived within five (5) minutes of Deps. Pedraza and Snyder who were already at the residence. (Tr. 17:17-23). Inside the residence, Dep. Newmark noted a collage of photos on the wall. (Tr. 19:1-4). The photos depicted gang names and various individuals including the Defendant making gang signs. (Tr. 19:1-4). Upon entry into the residence, Dep. Newmark and Dep. Snyder performed a security sweep of the residence. (Tr. 19:11-15).

Dep. Newmark made contact with Candace Perez, whom he believed to be the Defendant's girlfriend.[1] (Tr. 19:23-24). She told Dep. Newmark that she and the Defendant had a baby together. (Tr. 20:14-15). Perez also informed Dep. Newmark that she and the Defendant lived in the front bedroom and she showed him the room. (Tr. 20:24-25, 21:1). Dep. Newmark asked Perez if he could go inside the bedroom and look around.(Tr. 21:2-7). According to Dep. Newmark Perez said something along the lines of "sure go ahead." (Tr.21:2-12, 27:9-11). Dep. Newmark testified that Perez was not combative and he felt invited. (Tr. 21:8-12).

Dep. Newmark said the bedroom contained a bed, a flat screen T.V., and accordion closet door inscribed with the name "Sur 13." (Tr. 21:15-23). Dep. Snyder accompanied Dep. Newmark into the room. (Tr.22:1-2). Dep. Newmark stated that he opened the closet door and looked inside the closet. (Tr. 22:3-4). The closet contained clothes consistent with gang activities such as jerseys with specific colors and numbers. (Tr. 22:5-10). Dep. Newmark also noticed a folded Mexican national flag in the closet. (Tr. 22:14-17). In his experience he testified that he knows that gang

---

[1] Perez testified that she and the Defendant were married on December 14, 2007.

members often will have a Mexican flag with the name of a gang inscribed on it somewhere. (Tr. 22:22-25, 23:1). He reached for the flag and noticed the shape of a gun folded into the flag. (Tr. 23:12-14). There was a ski mask next to it and a few glass pipes. (Tr. 23:3-4). Dep. Newmark asked Perez if the flag was hers to which she stated "it must be his because it was not hers." (Tr. 22:16-18). Dep. Newmark secured the gun and made sure there were no rounds of ammunition in the chamber. (Tr. 24:24-25, 25:1). A magazine and ammunition for the gun was also found in the closet. (Tr. 25:2-6). The officers kept the gun and had the Defendant sign a property receipt. (Tr. 25:18-22).

In addition to the flag, related ammunition and magazine, and black ski mask, Dep. Newmark found a Social Security card, resident card, a passport, and there may have been a Florida ID as well. (Tr. 27:19-24). Dep. Newmark said the documents were not in plain view but were discovered during the search of the closet. (Tr. 28:1-8). The documents were photographed and returned to the Defendant. (Tr. 28:11-14).

Dep Newmark testified that no one invited him inside the residence but that officers were already present and inside when he arrived on the scene. (Tr.26:16-22).

**James J. Snyder (Tr. 29-36).**

James Snyder ("Dep. Snyder") has served with the CCSO for approximately three (3) years, and has been on the CCSO Gang Task Force for the last six (6) months. (Tr. 2-:20-25). On July 30, 2008, he was investigating gang related activity at the Defendant's residence. (Tr. 30:1-6). When Dep. Snyder arrived at the Defendant's residence, Dep. Pedraza was already at the door. (Tr.30:9-11). Dep. Pedraza spoke fluent Spanish and was speaking in Spanish with the Defendant. (Tr. 30:17-19).

After entering the residence, Dep. Snyder immediately performed a security sweep of the residence. (Tr. 30:20-25, 31:1-6). He entered the first room on the right which was the bedroom area. (Tr. 31:7-9). Dep. Snyder said he noticed writing on the wall of the room and pictures on the wall with indications of criminal street gang activity. (31:16-18). He stated the writing on the doorframe related to the street gang Sur. (Tr. 31:22-25, 32:1-6).

Dep. Snyder asked a young women, Perez, if he could go into the bedroom and look around. (Tr. 32:8-10). Dep. Snyder stated he could not remember the young woman's name. (Tr. 32:21-22). The young woman identified herself as the Defendant's wife and told Dep. Snyder that she lived in the bedroom and gave her consent for him to enter the room "look wherever you want to look." (Tr. 32:13-25, 33:1-7). Once inside the room, Dep. Snyder looked inside two closets and found two marijuana smoking devices and documentation. (Tr.33:13-25). The young woman was present when Dep. Snyder looked in the closet and when he found the pipe and documents and he testified that her demeanor was "very calm, cooperative, and non-argumentative. (Tr. 33:10-11). Dep. Snyder was also present when Dep. Newmark found the gun and ammunition. (Tr.33:19-21). He asked the young woman if the gun and ammunition were hers and she denied owning the gun and the ammunition. (Tr.34:1-5). Perez never asked the deputies to go and get a search warrant. (Tr. 33:8-9).

**John P. Pedraza (Tr. 36-44)**.

John Pedraza ("Dep. Pedraza")has served with the CCSO for five (5) years and has been assigned to the CCSO Gang Task Force for the last year. (Tr. 36:13-18). On July 30, 2008, Dep. Pedraza arrived at the Defendant's residence to investigate possible gang activity. (Tr. 36:19-21). Dep. Pedraza took part in the investigation because he is fluent in the Spanish language. (Tr. 36:22-25, 37: 1-3).

Dep. Pedraza testified that he knocked on the Defendant's door and asked the female who answered the door if he could speak to the man of the house. (Tr. 37:9-11). The Defendant came to the door. (Tr. 37:10-11). Dep. Pedraza told the Defendant who he was and asked if he could come inside and look at the Defendant's collage of alleged gang photos. (Tr. 38:1-4). The Defendant agreed to allow Dep. Pedraza into the residence. (Tr. 38:6). There were, at that time, four (4) adults and one (1) child all in the residence's common area. (Tr. 39:2-3). There were no restrictions placed on anyone's movement, in fact, everyone was free to move about as they wished. (Tr. 39:6-7). Dep. Pedraza stated the Defendant's demeanor was "regular" and "conversational" while he was speaking with him. (Tr. 39:12-14).

The Defendant told Dep. Pedraza the photos were just a joke and that he and his brother were not really in a street gang. (Tr. 39:15-19). Dep. Pedraza also spoke with the Defendant about Candace Perez. (Tr. 39:24-25:24-25). The Defendant stated that he lived in the residence with Perez, their daughter, his brother, his brother's wife and children. (Tr. 40:12-21). Dep. Pedraza testified that he never asked the Defendant to search the rest of the residence but that Dep. Newmark did ask for permission to search. (Tr.41:6-10). The Defendant never said you cannot go into the bedroom nor did he ever ask for a search warrant. (Tr.42:6-13). The Defendant appeared to understand some English. (Tr. 41:20-22).

Once the gun was found in the closet, the Defendant was read his <u>Miranda</u> rights in English and in Spanish. (Tr.42:25,43:1-7). Dep. Pedraza and Dep. Meek went outside with the Defendant to discuss the firearm. (Tr. 43:10-14). The Defendant told Dep. Pedraza the gun belonged to a friend, the ski mask belonged to his nephew, and that he sometimes wore the ski mask to work. (Tr. 43:16-23).

**Candace Perez (Tr. 45-64)**.

Perez is the Defendant's wife and the mother of his child. (Tr. 46:16-19). Perez lives at 2180 41st Street in the Golden Gate area near Naples, Florida, with the Defendant, his brother, her sister-in-law, her niece and nephew. (Tr. 46:8-15). According to Perez, on July 8, 2008, the Defendant and Perez were asleep in their bedroom when the Defendant's brother woke them up to let them know the police were there. (Tr. 47:2-4). She testified that during their first visit, the deputies told the Defendant they were looking for suspects involved in a robbery. (Tr.47:5-6).

The officers came back a second time[2] and asked to look at the gang photos on the wall and said after that they would leave them alone. (Tr. 48:9-23). Perez testified that when the police returned they knocked on the door and when the Defendant opened the door, the officers walked inside without being invited. (Tr. 48:24-25). The Defendant and her brother- in-law went outside to speak with the officers. (Tr. 48:10-25, 49:1-8). When asked about the photos, the Defendant told the officers they were not gang photos, but he and some of his friends were just playing around. (Tr. 48:12-14).The deputies walked through the house without asking permission including going in and out of her brother-in-law's bedroom and her bedroom. (Tr. 49:6-14). One deputy called her into her bedroom. (Tr. 50:12-20). When she entered her bedroom, she saw a gun laying in the middle of the flag on the bed. (Tr. 50:13-20). One of the deputies asked her if the gun was hers. (Tr. 50:22-24). She told him no.(Tr. 50:22-24). The deputy then told her to sit on the bed. (Tr. 51:13-16). Perez on cross examination said the deputy took the gun and placed it in his front of his pants and walked out of the room. (Tr. 50:23-25, 62:7-12).

---

[2] The police returned to the residence on July 30, 2008.

The deputy started looking in one of the boxes that had been found in the closet. (Tr. 51:1-7). She had not given him permission to look inside the box. (Tr. 51:8-12). The deputy also found marijuana pipes in the closet and asked if the pipes were hers. (Tr. 51:18-20). The deputy then opened another box and found the bullets and the magazine to the gun. (Tr. 51:21-22). They looked in the last box and found pictures. The deputy started looking at the pictures and then left the room taking the pictures with him. (Tr. 52:12-21). They looked in one of the Defendant's binders and found the Defendant's passport, birth certificate, and other papers. (Tr. 52:22-25, 53:1-9). Perez testified that she never gave the deputies permission to go into the bedroom, the closet, nor into the boxes. (Tr. 53:11-19). Perez further stated the deputies never asked her permission to enter the room and perform the search. (Tr. 17-25, 54:1-4).

On cross examination, Perez reiterated that she never gave the deputies permission to search the residence. (Tr. 59:1-4, 59:15-24). Perez said there were no gang photos or symbols in her bedroom only pictures of her husband and their daughter. (Tr. 58:9-13). However, she did admit that the name "Sur 13" was written on the closet doors. (Tr. 58:15-20). Perez testified that no one was angry but that she was not free to move about the apartment. (Tr. 60:8-11). However, on cross examination she stated that she was in the residence's living room and that no one forced her to stay and that she could move around. (Tr. 61:1-5). Perez also testified that she stayed in the bedroom after the deputies exited and then got up and left the room. (Tr.63:23-25). The Defendant was not arrested on that day. (Tr. 64:1-3).

## DISCUSSION

The Defendant moves the Court to suppress the evidence and statements made during the CCSO's investigation on July 30, 2008. As grounds, the Defendant states the scope of the search

exceeded the scope of the consent given by the Defendant. In the alternative, the Defendant argues that if the consent was broad enough to encompass the search of the bedroom and closet, the discovery of contraband not related to the initial search for gang activity, obligated the officers to discontinue the search and obtain a search warrant. The Defendant presented no evidence in his memorandum nor argument at the hearing related to the suppression of any incriminating statements he may have made. In response, the Government contends the deputies had the Defendant and/or Perez' consent to search the bedroom and closet.

Due to the conflict in the testimony of Deputies Newmark and Snyder, and Perez, regarding the consent to search the bedroom, the Court must first perform a credibility analysis before examining the issues.

(1) *Credibility Analysis*

When weighing the credibility of witnesses, the Court does not look at the status of the witness, but rather the Court must weigh the testimonies of all the witnesses, the consistencies or inconsistencies in their testimonies, their demeanor on the stand and the witnesses' interest in the outcome of the hearing.

In this instance, Deputies Snyder and Newmark testified that Perez gave them permission to search the bedroom. (Tr.32:8-25:33:1-7). Deputies Snyder and Newmark's testimony were consistent throughout. To the contrary, Perez had several important inconsistencies which cloud her credibility.

Perez testified that when the police returned to the residence on July 30, 2008, they knocked on the door and when the Defendant opened the door, the officers walked inside without being invited. (Tr.48:24-25). Initially, Perez' testimony is inconsistent with the factual representations in

the Defendant's own Motion to Suppress. In his Motion, the Defendant asserts when the officers returned to the residence on July 30, 2008, he "and his girlfriend Candace Perez consented to a further examination of the photographs on the front sitting room wall." (Doc. # 24, p. 2). Testimony that conflicts with the factual basis in the Defendant's own Motion clearly brings the credibility of the witness into question. *See* U.S. v. Dominquez, 2006 WL 1704461 * 7 (M.D. Fla. June 8, 2006) (finding the witnesses testimony as not credible because it conflicted with the factual basis in the defendant's motion to suppress).

Further, Perez testified there were no gang photos or symbols in her bedroom, only pictures of her husband and their daughter. (Tr.58:9-13). However, on cross examination she admitted that the name "Sur 13", a gang symbol, was written on the closet doors in her bedroom. (Tr.58:15-20). Additionally. Perez stated she was not free to move about the residence, however, when questioned about whether anyone told her that she could not leave the living room area she said no. (Tr.61:1-5). When Dep. Snyder and Newmark left the bedroom, she remained in the room and then later followed them to the livingroom without anyone directing her or forcing her. (Tr.63:23-25).

When considering who has the most to gain by their testimony, the Court notes that Perez is the Defendant's wife and the mother of their daughter. Therefore, she has a great deal at stake in the outcome of the hearing including the potential for her husband to be incarcerated or deported leaving her and her child in the United States.

Therefore, based upon Perez' inconsistent statements, her demeanor on the stand, and the fact that Perez has a substantial personal outcome in the suppression of the evidence, compared with the consistent testimony of the deputies, the Court finds that Perez' testimony is not credible.

### (2) Whether the Search went Beyond the Scope of the Consent

The Fourth Amendment protects individuals from unreasonable search and seizure. U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) *cert. denied,* 534 U.S. 830 (2001). A warrantless entry into a person's home to search the premises is presumed to be unreasonable. U.S. v. Ramirez-Chilel, 289 F.3d 744, 749-750 (11th Cir. 2002) (citing U.S. v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991)). While the Fourth Amendment generally prohibits the warrantless entry of a person's home, officers without a warrant or probable cause may conduct a search of a residence based upon the voluntary consent of the property owner. U.S. v. Garcia, 2006 WL 2644918, *4 (M.D. Fla. September 14, 2006) (citing Schnecklin v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2042, 36 L.Ed.2d 854 (1973)).

Here, the Defendant concedes that consent was given to allow the officers to enter the premises and view the photo collage on the livingroom wall. However, the Defendant argues the officers search of the Defendant's bedroom and closet exceeded the scope of the Defendant's limited permission to view those photos. The Defendant citing to United States v. Martinez, argues that the government cannot obtain consent to search for certain items and then subsequently use that consent to conduct a general exploratory search. 949 F.2d 1117, 1119 (11th Cir. 1992) (holding that the terms of the consent govern the scope of the search in the same manner as specifications in a warrant). Thus, the Defendant argues the discovery of the firearm was beyond the scope of the Defendant's consent which allowed the officers to look at gang photos on the livingroom wall.

Contrary to the Defendant's position, the Defendant's wife and a resident in the front bedroom, gave the deputies permission to look in the room. (Tr.32:8-25:33:1-7). Thus, the limited consent sought by Dep. Pedraza to look at the photo collage is not the applicable consent obtained

by Dep. Snyder and Dep. Newmark to search the bedroom. The Deputies, Newmark and Snyder, did not limit their requests to search the bedroom to gang related photos.

Dep. Newmark testified that Perez told him she and the Defendant lived in the front bedroom and she showed him the room. (Tr.20:24-25, 21:1). Dep. Newmark asked Perez if he could go inside the room.(Tr. 21:2-7). Perez consented to his entering the bedroom and she gave him permission to search the bedroom. (Tr. 21:2-12, 27:9-11). Likewise, Dep. Snyder made contact with Perez and asked for consent to "look around." (Tr.32:8-10). Perez consented to Dep. Snyder looking around. (Tr. 32:13-25, 33:1-7). The Eleventh Circuit has held that comments by officers that they wanted to look around the house is a sufficient request to search a residence. U.S. v. Pineiro, 389 F.3d 1359, 1362 (11th Cir. 2004) (holding that the Defendant's consent to the officer's request to look around the house was voluntary).

While Dep. Snyder stated he could not remember the young woman's name, the young woman identified herself as the Defendant's wife and told Dep. Snyder that she lived in the bedroom. (Tr. 32:21-22, 32:13-25, 33:1-7). The young woman then gave her consent for him to enter the room and told him he could look wherever he wanted. (Tr. 32-13-25, 33:1-7). At no time did the Defendant tell the deputies that he did not want them searching the bedroom or the closet. (Tr. 33:8-9). Perez, as a resident of the apartment, and in particular the front bedroom, had every right to consent to the search, and did so without any qualifications. Thus, the deputies had full consent to search the entire bedroom regardless of the separate conversation between Dep. Pedraza and the Defendant.

## (3) Whether the Discovery of the Firearm Obligated the Officers to Discontinue the Search and Obtain a Search Warrant

The government cannot obtain consent to search for certain items and then subsequently use that consent to conduct a general exploratory search. Martinez, F.2d at 1119 (holding that the terms of the consent govern the scope of the search in the same manner as specifications in a warrant). The Defendant argues the discovery of the firearm exceeded the scope of the consent which was limited to photos of alleged gang activity. Thus, the Defendant argues that the officers were required to stop the search and obtain a search warrant for the residence based upon the discovery of the gun. The Government responds that the officers had unqualified consent to search the closet.

The Defendant argues from United States v. Lucas, 2008 WL 4858197 (W.D. Ken. 2008), and United States v. Coles, 437 F.3d 361 (3d Cir. 2006), to support his position that the search was beyond the scope of the consent. In Lucas, the Defendant signed a consent to search form allowing the officers to search for drug paraphernalia. During the search one of the officers opened Lucas' computer looking for a spread sheet detailing the growth of the marijuana plants in the residence similar to a handwritten one found on the table beneath the computer. Id. at *2. Instead of a growth chart, the officers found child pornography. Id. at *3. The Lucas Court held that the child pornography discovery was beyond the scope of the consent to search for drug related activities.

However, in this instance unlike the Lucas case, Dep. Newmark and Dep. Snyder testified that Perez gave them unqualified consent to search the room. (Tr. 21:2-12, 27:9-11, 32:13-25, 33:1-7). Dep. Snyder testified the young woman identified herself as the Defendant's wife and told him she lived in the bedroom and gave her consent for him to enter the room and told him he could look wherever he wanted. (Tr. 32:13-25, 33:1-7). Likewise, Dep. Newmark asked Perez if he could go inside the room.(Tr. 21:2-7). Perez consented to his entering the bedroom and she gave him

permission to search. (Tr. 21:2-12, 27:9-11). Thus, there was no qualified consent on the part of Perez like in Lucas. Instead, Perez consented to the deputies search of the bedroom without any limitations or restrictions.

It is clear based upon Dep. Newmark and Dep. Snyder's testimonies that Perez gave her consent to search the room. However, even if her consent was limited to the search of gang related photos and activities, the deputies still had reasonable belief they could enter the closet to search for gang related activity. Courts have found that a general consent to search for specific items includes consent to search any compartment or container that might reasonably contain those items. U.S. v. Zapata, 180 F. 3d 1237, 1243 (11th Cir. 1999). The bedroom's accordion closet door was inscribed with the name "Sur 13." (Tr. 21:15-23). Dep. Newmark stated that he opened the closet door and looked inside the closet. (Tr. 22:3-4). It was reasonable to look inside the closet due to the nature of the inscription which was a strong indicator that other gang related material may be found in the closet because the closet door was inscribed with the gang name "Sur 13." The closet contained clothes consistent with gang activities such as jerseys with specific colors and numbers. (Tr. 22:5-10). Dep. Newmark also noticed a folded Mexican national flag in the closet. (Tr. 22:14-17). Based on his training and experience, Dep. Newmark testified that he knows gang members often will have a Mexican flag with the name of the gang inscribed on it. (Tr. 22:22-25, 23:1). Dep. Newmark checked the flag and found the gun. Thus, the finding of the firearm did not reach beyond the search for gang related activity.

Further, if the officers were looking for gang related photos, it could reasonably be assumed that such photos might be stored in a closet with the gang's name inscribed on the door. Thus, it was reasonable even if the consent only applied to gang related activity for Dep. Newmark to investigate

the flag and the boxes. Thus, the search which resulted in the finding of the gun and the false documents was not beyond the scope of the Defendant's consent even if that consent was limited to gang related photos and/or activities.

### *(4) Whether the Defendant's Miranda Rights were Violated.*

In his Motion, the Defendant states any statements he made should be suppressed. However, the Defendant made no argument either in his memorandum or at the hearing to support his Motion to Suppress Statements. Nevertheless, the Court will look to the statements to see if any Miranda violations may have occurred.

Miranda v. Arizona, requires that before a defendant in custody can be interrogated that the Defendant be informed of: (1) the Defendant's right to remain silent; (2) that statements can and will be used against them in a court of law; (3) that the Defendant has the right to an attorney during questioning; and (4) that if the Defendant cannot afford an attorney one will be appointed. 384 U.S. 436, 478-479, 86 S. Ct. 1602, 16 L. Ed. 694 (1966). Under Miranda, custody is the depravation of freedom of action normally associated with an arrest. Id. at 444. The initial determination of custody depends on the objective circumstances of interrogation and not on the subjective views harbored by either the officer or the Defendant. Stansbury v. California, 511 U.S. 318, 323 (1994) (*per curiam*). A person detained pursuant to a routine traffic stop is not ordinarily considered in custody. Berkemer v. McCarty, 468 U.S. 420, 441, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

The Supreme Court defined interrogation as "express questioning or words and actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 300-301, 100 S. Ct. 1682, 64 L. Ed.

297 (1980). Some types of questions are not considered interrogations and therefore do not require Miranda warnings.

In this instance, once the gun was located in the bedroom closet, the Defendant was read his Miranda rights in Spanish. (Tr. 13:11-15, 42:25, 43:1-7). The Defendant acknowledged his rights. (Tr. 43:1-4). No evidence or testimony was presented to contradict the officers statements that the Defendant was fully aware of his rights and voluntarily agreed to speak with them concerning the gun and any other comments. According to the deputies, the encounter was entirely conversational and relaxed and the Defendant fully cooperative. Thus, it is respectfully recommended the Defendant's Miranda rights were not violated and no incriminating statements should be suppressed.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

The Defendant Guillermo Ramirez-Vazquez's Motion to Suppress (Doc. #24) should be **DENIED**.

**Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.**

Respectfully recommended at Fort Myers, Florida, this __16th__ day of January, 2009.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record